JS - 6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO:** |
| Plaintiff(s), | **SACV 11-01977 JVS(JPRx)** |
| | consolidated with |
| | SACV 12-00472 JVS (JPRx) |
| v. | |
| | RULING ON CROSS-MOTIONS |
| TIMOTHY J. DEAN *et al.*, | FOR SUMMARY JUDGMENT |
| Defendant(s). | |

Plaintiff United States of America ("the Government") moves for summary judgment against Defendants Timothy J. Dean, Michelle X. Dean, and John K. O'Brien (collectively, "Defendants") pursuant to Federal Rule of Civil Procedure 56. Defendants cross-move for summary judgment. Both motions are opposed.

1

For the following reasons, the Court DENIES the Government's motion and GRANTS Defendants' motion.

**I.     Facts**

The facts provided herein are uncontroverted, unless otherwise noted. The parties do not dispute any material fact.

   A.     Houdini, Inc.

Defendant Timothy J. Dean ("Dean") began selling gift baskets in 1984. (Pl.'s Statement of Uncontroverted Facts & Conclusions of Law ("Pl.'s SUF") ¶ 1.)[1] Defendant John O'Brien ("O'Brien") was the first person that Dean brought

---

[1] The Court "may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion." C.D. Cal. L.R. 56-3. The Court has reviewed all evidence submitted by the parties; however, the Court cites only one source of any duplicative evidence herein. The Court does not accept any legal conclusions

on to assist him. (Id. ¶ 3.) In 1989, Dean and O'Brien incorporated their business as Houdini, Inc. ("Houdini"). (Id. ¶ 4.) In 1998, Houdini was changed from a C corporation to an S corporation. (Id. ¶¶ 5-7.) During 2005 and 2006, Dean owned 75 percent of the stock in Houdini and O'Brien owned 25 percent of the stock in Houdini. (Id. ¶¶ 9-10.)

Houdini describes its business as the design, assembly, and sale of gift baskets and gift towers through both wholesale and retail channels.[2] (Id. ¶ 12.) A "gift tower" is a set of decorative boxes into which different food items are placed. (Id. ¶ 14.) Houdini has two facilities in Fullerton, California and one facility in Buena Park, California. (Id. ¶ 26.) Houdini maintains about 300 employees. (Id. ¶ 28.) In addition, Houdini hires about 4,000 temporary workers during the peak season of August through December. (Id. ¶ 29.) During the holiday season, Houdini can complete up to 80,000 baskets in a day. (Id. ¶ 31.) More than 90 percent of Houdini's sales occur during the holiday season. (Defs.' Statement of

---

presented as facts by the parties. See C.D. Cal. L.R. 7-7.

[2] Houdini engages in retail sales through direct marketing by mail and through a website using the assumed name of Wine Country Gift Baskets. (Pl.'s SUF ¶ 21.) Typically, retail customers order a gift basket or gift tower for a third-party, who Houdini denominates as the gift recipient. (Id. ¶ 23.) About two-thirds of Houdini's gross revenue comes from the retail side. (Id. ¶ 24.) Houdini does not maintain a storefront. (Id. ¶ 25.)

3

Uncontroverted Facts & Conclusions of Law ("Defs.' SUF") ¶¶ 4-5.)

### B. The Production Process

Houdini's production process is essentially the same today as it was in 2005 and 2006. (Id. ¶ 7.) Designing a Houdini gift basket involves, among other things, selecting the basket and the items to be placed inside,[3] as well as the "void fill" that holds everything together.[4] (Pl.'s SUF ¶¶ 32-33.) Houdini orders its baskets from suppliers in China. (Id. ¶ 34.) When it orders baskets, Houdini reviews samples and then provides the manufacturer with exact specifications for them. (Id. ¶ 35.) Houdini also purchases containers from suppliers in the United States. (Id. ¶ 36.)

---

[3] Common items placed inside a gift basket include, without limitation, chocolates, cookies, candy, cheeses and crackers, and wine or alcohol. (Defs.' SUF ¶ 13.)

[4] Defendants do not dispute this, but contend that designing a gift basket is a complicated process that involves "container sizing, container coloration, container materials selection, container sourcing and quality control, container content selection, container content design, void fill selection, product op, packaging review, licensing agreements and legal review, and price pointing." (Defs.' Response to SUF ¶ 32.) Defendants clarify that Houdini designs its baskets and then outsources their production. (Id. ¶ 33; Defs.' SUF ¶ 24.)

4

1  The void fill in a Houdini gift basket is a cardboard form or Styrofoam base that is
2  placed inside the basket; the other items are in turn placed inside. (Id. ¶ 37.)
3  Houdini generally designs the cardboard forms, indicating where the cuts and folds
4  should be made; it then hires another company to make the cardboard forms. (Id.
5  ¶ 38.) On occasion, Houdini purchases baskets with the void fill already included.
6  (Id. ¶ 39.) Houdini purchases the items that are placed inside the baskets from other
7  companies. (Id. ¶ 43.) Houdini likes to use as many name-brand products in its
8  baskets as possible. (Id. ¶ 44.)

10  Individual food items in Houdini's gift baskets are either purchased in
11  individually wrapped packages or in bulk. (Id. ¶ 47.) For food items purchased in
12  bulk, Houdini contracts with a co-packer to package the food items into small,
13  sealed packages.[5] (Id. ¶ 48.) For bulk orders, the food items are shipped directly
14  from the manufacturer to the co-packer, although it is Houdini that actually
15  purchases the food items. (Id. ¶ 49.) Houdini's Packaging Department takes food
16  items that are in small, food-safe containers and places them in other packaging,
17  such as a small, colorful box.[6] (Id. ¶¶ 50-51.) Houdini is not a "food-safe" facility,

---

[5] Houdini refers to this as the "subassembly process." (Defs.' SUF ¶¶ 16, 28-29.)

[6] For boxes containing food items, Houdini designs the boxes, but they are made by a different company. (Pl.'s SUF ¶ 45.) Houdini rarely uses the packaging provided by the original food manufacturer. (Defs.' SUF ¶ 27.)

5

which means that it does not handle unwrapped food items; Houdini uses only food items that are already in a sealed container. (Id. ¶ 52.)

Houdini's assembly line consists of workers who place the individual food items into baskets in accordance with detailed work instructions prepared by Houdini. (Id. ¶ 64; Defs.' SUF ¶ 10.) In preparing a finished gift basket, employees at several different stations on the line put different items into the basket.[7] (Pl.'s SUF ¶ 66.) After the items have been placed inside the basket, a plastic wrapping is heated to shrink around the basket. (Id. ¶ 67.) Once the plastic wrapping is completed, a bow is placed on the basket, if called for in the design of the basket. (Id. ¶ 71.) For a gift tower, the food-safe packages are placed directly into decorative boxes. (Id. ¶ 73.) The boxes in the gift tower are then connected either through cardboard tabs or through sticky-dot adhesives. (Id. ¶ 74.) For wholesale customers, Houdini sells the gift baskets and gift towers on pallets that are placed directly on the sales floor. (Id. ¶ 76.)

C. Federal Income Tax Returns for Taxable Year 2005

---

[7] The items generally need to be glued down, stacked, tied down, or specially attached to the basket to provide stability and satisfy the design concept. (Defs.' SUF ¶ 17.)

6

Houdini filed a federal income tax return for an S corporation (Form 1120S) for taxable year 2005 in September 2006. (Id. ¶ 77.) It did not claim any deduction under I.R.C. § 199 on the original tax return. (Id. ¶ 79.) It filed an amended tax return for 2005 in September 2009. (Id. ¶ 80.) In the amended tax return, Houdini claimed a deduction under I.R.C. § 199 in the amount of $275,982. (Id. ¶ 81.)

The Deans filed a federal income tax return for taxable year 2005 in October 2006. (Id. ¶ 78.) They did not claim any deduction under I.R.C. § 199 on the original tax return. (Id. ¶ 79.) They filed an amended tax return for 2005 in October 2009. (Id. ¶ 82.) In the amended tax return, the Deans claimed a deduction under I.R.C. § 199 in the amount of $206,987, a 75 percent share of the deduction under I.R.C. § 199 claimed by Houdini on its Form 1120S for 2005. (Id. ¶ 83.) Based on the deduction under I.R.C. § 199, the Deans claimed a tax refund of $74,618 was due to them for 2005. (Id. ¶ 84.) On December 28, 2009, the IRS issued a tax refund check to the Deans in the amount of $94,364.39, which consisted of the amount claimed on the amended tax return plus interest. (Id. ¶ 85.) The Deans deposited the check from the IRS on January 22, 2010, and the funds were paid by the U.S. Treasury on January 26, 2010. (Id. ¶ 86.)

D.   Federal Income Tax Returns for Taxable Year 2006

Houdini filed a federal income tax return for an S corporation for taxable year 2006 in September 2007. (Id. ¶ 87.) It did not claim any deduction under I.R.C. § 199 on the original tax return. (Id. ¶ 89.) It filed an amended tax return for

2006 in September 2010. (Id. ¶ 90.) In the amended tax return, Houdini claimed a deduction under I.R.C. § 199 and provided information it claimed related to domestic production activities on the attached K-1s for its shareholders. (Id. ¶ 91.)

The Deans filed a federal income tax return for taxable year 2006 in October 2007. (Id. ¶ 88.) They did not claim any deduction under I.R.C. § 199 on the original tax return. (Id. ¶ 89.) They filed an amended tax return for 2006 in October 2010. (Id. ¶ 92.) In the amended tax return, the Deans claimed a deduction under I.R.C. § 199 in the amount of $394,770 based on the domestic production activities claimed by Houdini on its amended Form 1120S for 2006. (Id. ¶ 93.) Based on the deduction under I.R.C. § 199, the Deans claimed a tax refund of $140,933 was due to them for 2006. (Id. ¶ 94.) On March 14, 2011, the IRS issued a tax refund check to the Deans in the amount of $172,884.67, which consisted of the amount claimed on the amended tax return plus interest. (Id. ¶ 95.) The Deans deposited the check from the IRS on April 13, 2011, and the funds were paid by the U.S. Treasury on April 15, 2011. (Id. ¶ 96.)

O'Brien filed a federal income tax return for taxable year 2006 in October 2007. (Id. ¶ 97.) He did not claim any deduction under I.R.C. § 199 on the original tax return. (Id. ¶ 98.) He filed an amended tax return for 2006 in October 2010. (Id. ¶ 99.) In the amended tax return, O'Brien claimed a deduction under I.R.C. § 199 in the amount of $135,146 based on the domestic production activities claimed by Houdini on its amended Form 1120S for 2006. (Id. ¶ 100.) Based on the deduction under I.R.C. § 199, O'Brien claimed a tax refund of $48,247 was due to him for

2006. (Id. ¶ 101.) On March 14, 2011, the IRS issued a tax refund check to O'Brien in the amount of $58,829.69, which consisted of the amount claimed on the amended tax return plus interest. (Id. ¶ 102.) O'Brien deposited the check from the IRS on or before January 10, 2011, and the funds were paid by the U.S. Treasury on January 10, 2011. (Id. ¶ 103.)

     E.    The Lawsuit

Section 7405 of the Internal Revenue Code provides, in relevant part, that "[a]ny portion of a tax imposed by this title which has been erroneously refunded . . . may be recovered by civil action brought in the name of the United States." I.R.C. § 7405(b). To prevail in such an action, the Government must establish "(1) that a refund was paid to the taxpayers; (2) the amount of the refund; (3) that the government's recovery action was timely; and (4) that the taxpayers were not entitled to the refund which the government seeks to recover." United States v. Shannahan, No. 98-CV-1914-L(RBB), 2000 U.S. Dist. LEXIS 5072, at *5 (S.D. Cal. Feb. 8, 2000) (citing United States v. Commercial Nat'l Bank of Peoria, 874 F.2d 1165, 1169 (7th Cir. 1989)).

The Government filed this action against Defendants on December 21, 2011. It seeks to recover the tax refunds to Defendants for taxable years 2005 and 2006 based on the deductions they claimed under I.R.C. § 199 plus interest. The parties do not dispute that refunds were paid to Defendants for taxable years 2005 and 2006, the amount of those refunds, or that the Government timely brought this

9


recovery action. The only issue is whether Defendants were entitled to those refunds.

## II. Legal Standard

Summary judgment is appropriate where the record, read in the light most favorable to the nonmovant, indicates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Summary adjudication, or partial summary judgment "upon all or any part of [a] claim," is appropriate where there is no genuine dispute as to any material fact regarding that portion of the claim. Fed. R. Civ. P. 56(a); see also Lies v. Farrell Lines, Inc., 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . . .") (internal quotation marks omitted).

Material facts are those necessary to the proof or defense of a claim, and are determined by referring to substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

The moving party has the initial burden of establishing the absence of a

material fact for trial. <u>Anderson</u>, 477 U.S. at 256. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . ., the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). Furthermore, "Rule 56[(a)][8] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 323. Therefore, if the nonmovant does not make a sufficient showing to establish the elements of its claims, the court must grant the motion.

Where the parties have made cross-motions for summary judgment, as the parties have done here, the Court must consider each motion on its own merits. <u>Fair Hous. Council v. Riverside Two</u>, 249 F.3d 1132, 1136 (9th Cir. 2001). The Court will consider each party's evidentiary showing, regardless of which motion the evidence was tendered under. <u>See</u> <u>id.</u> at 1137.

**III.    <u>Discussion</u>**

---

[8] Rule 56 was amended in 2010. Subdivision (a), as amended, "carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word—genuine 'issue' becomes genuine 'dispute.'" Fed. R. Civ. P. 56, Notes of Advisory Committee on 2010 amendments.

11

A.     Section 199

Section 199 of the Internal Revenue Code allows a taxpayer to deduct a specified percentage of "qualified production activities income" for the taxable year. I.R.C. § 199(a)(1)(A). Section 199 was phased in over time: a three percent deduction was available for taxable years 2005 and 2006, and a nine percent deduction is available today. § 199(a)(2). "Qualified production activities income" is defined as the taxpayer's "domestic production gross receipts" ("DPGR") minus the related cost of goods sold and other expenses, losses, or deductions. § 199(c)(1). DPGR is defined, in relevant part, as the taxpayer's gross receipts derived from "any lease, rental, license, sale, exchange, or other disposition of . . . qualifying production property which was <u>manufactured, produced, grown, or extracted</u> by the taxpayer in whole or in significant part within the United States." § 199(c)(4) (emphasis added).

Section 199 does not define "manufactured, produced, grown, or extracted" ("MPGE"). It does, however, provide that "[t]he Secretary shall prescribe such regulations as are necessary to carry out the purposes of this section." § 199(d)(10). MPGE is defined broadly in the Treasury Regulations to include "manufacturing, producing, growing, extracting, installing, developing, improving, and creating [qualified production property ("QPP")]; making QPP out of scrap, salvage, or junk material as well as from new or raw material by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles." Treas. Reg. § 1.199-3(e)(1), 26 C.F.R. 1.99-3 (2006). "If a taxpayer

packages, repackages, labels, or performs minor assembly of QPP and the taxpayer engages in no other MPGE activity with respect to that QPP, the taxpayer's packaging, repackaging, labeling, or minor assembly does not qualify as MPGE with respect to that QPP." § 1.199-3(e)(2).

### B. Applicable Burdens of Proof

Under Federal Rule of Civil Procedure 56, the movant bears the burden of proving that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex, 477 U.S. at 322-23.

In a recovery action brought under I.R.C. § 7405, the Government "bears the ultimate burden of proof to show . . . that some amount has been erroneously refunded" to Defendants. See Soltermann v. United States, 272 F.2d 387, 387 (9th Cir. 1959).

Here, because there is no genuine dispute as to any material fact, the parties must prove only that they are entitled to judgment as a matter of law.

### C. Analysis

The only issue is whether Defendants were entitled to the tax refunds for taxable years 2005 and 2006 based on the deductions they claimed under I.R.C.

§ 199. This question of law is suitable for disposition on summary judgment. Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003).

The Government contends that Houdini merely "packages" and "repackages" the items in its gifts baskets and gift towers. Therefore, according to the Government, Houdini was not entitled to the § 199 deduction for taxable years 2005 and 2006. See Treas. Reg. § 1.199-3(e)(2). On the other hand, Defendants contend that Houdini "manufacturers" or "produces" gift baskets and gift towers. Therefore, according to Defendants, they were entitled to the deduction for those taxable years. See Treas. Reg. § 1.199-3(e)(1).

Statutory interpretation "begins with the statutory text, and ends there as well if the text is unambiguous." BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183, 124 S. Ct. 1587, 158 L. Ed. 2d 338 (2004); Campbell v. Allied Van Lines, Inc., 410 F.3d 618, 622 (9th Cir. 2005). "[U]nless otherwise defined, words [in a statute] will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42, 100 S. Ct. 311, 62 L. Ed. 199 (1979). Resorting to legislative history and other extrinsic evidence as interpretive tools is inappropriate if the statute is clear on its face. United States v. Real Property Located at 475 Martin Lane, 545 F.3d 1134, 1143-44 (9th Cir. 2008). "In interpreting the Internal Revenue Code, [the Court must] strictly construe Code provisions granting exemptions and deductions." Durando v. United States, 70 F.3d 548, 550 (9th Cir. 1995) (citing INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 84,

112 S. Ct. 1039, 117 L. Ed. 2d 226 (1992); Grimes v. Comm'r, 806 F.2d 1451, 1453 (9th Cir. 1986)).

As noted above, § 199 does not define MPGE. However, Treasury Regulation § 1.199-3(e)(1) defines MPGE, as used in § 199, to include "manufacturing, producing, growing, extracting, installing, developing, improving, and creating QPP; making QPP out of scrap, salvage, or junk material as well as from new or raw material by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles." Treasury Regulation § 1.199-3(e)(2) adds that "packaging, repackaging, labeling, or minor assembly" does not qualify as MPGE. It is clear from the text of subsection (e)(2) that packaging or repackaging does not qualify as MPGE only if "the taxpayer engages in no other MPGE activity with respect to that QPP." Treas. Reg. § 1.199-3(e)(2).

The Court must give the words used to define MPGE their "ordinary, contemporary, common meaning." Accordingly, the Court first considers the following pertinent dictionary definitions:

manufacture (*v*)
1: to make into a product suitable for use
2  a: to make from raw materials by hand or by machinery
   b: to produce according to an organized plan and with division of labor

15

package (*v*)

1   a:   to make into a package; *especially*: to produce as an entertainment package

     b:   to present (as a product) in such a way as to heighten its appeal to the public

2:   to enclose in a package or covering

produce (*v*)

5   a:   to cause to have existence or to happen

     b:   to give being, form, or shape to: MAKE; *especially*: MANUFACTURE

repackage (*v*)

to package again or anew; *specifically*: to put into a more efficient or attractive form

Merriam-Webster Online, http://www.merriam-webster.com/dictionary/ (last visited Apr. 25, 2013).

Houdini makes products suitable for use as gifts using machinery, according to an organized plan and with division of labor. Therefore, Houdini's production process may qualify as manufacturing or producing. On the other hand, Houdini takes various items and puts them together to make a package in a more attractive form that appeals to the public. Therefore, Houdini's production process may also

qualify as packaging or repackaging. Accordingly, the Court must look beyond these common definitions.[9]

Defendants argue that Houdini's production process "chang[es] the form of an article" within the meaning of Treasury Regulation § 1.199-3(e)(1). The Court agrees. Houdini first selects various items—chocolates, cookies, candy, cheeses, crackers, wine or alcohol, packaging materials, and a basket or boxes—for its final products. Next, the individual items are assembled in a gift basket or gift tower based on one of many detailed plans. This complex production process relies on both assembly line workers and machines.[10] The final products, gift baskets and gift towers, are distinct in form and purpose from the individual items inside. The individual items would typically be purchased by consumers as ordinary groceries. But after Houdini's production process, they are transformed into a gift that is usually given during the holiday season.[11]

---

[9] Neither party has identified case law directly on point, and the Court has not found any through its own research. It appears this is an issue of first impression.

[10] Although some of Houdini's activities may constitute packaging or repackaging, this "subassembly process" is only part of the complex production process that results in a distinct final product. See Treas. Reg. 1.199-3(e)(2).

[11] Regardless of how Houdini markets the gift baskets and gift towers, it is clear from the sales patterns that the products are purchased almost exclusively as

17

1  Example 6 in Treasury Regulation § 1.199-3(e) does not convince the Court
2  otherwise. Example 6 provides:

4     X purchases automobiles from unrelated persons and customizes them
5        by adding ground effects, spoilers, custom wheels, specialized paint
6        and decals, sunroofs, roof racks, and similar accessories. X does not
7        manufacture any of the accessories. X's activity is minor assembly
8        under paragraph (e)(2) of [§ 199] which is not an MPGE activity.

10 MPGE. § 1.199-3(e)(5). The Government contends that Houdini, like X, merely
11 performs a service—packaging and repackaging—that adds value to the final
12 product. But the Court agrees with Defendants that Example 6 is distinguishable
13 from Houdini's production process. Unlike X, which does not change the form or
14 function of the car by adding accessories to it, Houdini changes the form and
15 function of the individual items by creating distinct gifts. Furthermore, the Court
16 considers Houdini's complex production process as more similar to purchasing
17 various automobile parts from suppliers—such as the frame, engine, wheels, etc.—
18 and assembling them to create the car itself, which is undoubtably manufacturing.

20    In the alternative, Defendants contend that Houdini "combin[es] or
21 assembl[es] two or more articles" within the meaning of Treasury Regulation
22 § 1.199-3(e)(1). This argument is tested by Example 6. Nevertheless, the Court

---

24 gifts.

finds that the combination of products to create a new product—a gift—is not defeated by Example 6. In the end, the additions in Example 6 enhance but do not change the nature of the product. By contrast, Houdini creates a new product with a different demand.

The IRS has stated that "the [IRS] and Treasury believe that Congress intended for the deduction under § 199 to be available for a wide variety of production activities," and therefore "defines MPGE broadly." I.R.S. Notice 2005-14, 2005-1 C.B. 498, 2005 WL 100933. This further supports the Court's interpretation of MPGE, as used in § 199. See Davis v. United States, 495 U.S. 472, 484, 110 S. Ct. 2014, 109 L. Ed. 2d 457 (1990) (noting that courts give "considerable weight" to the interpretations and practices of the IRS).[12]

---

[12] The Court does not rely on the opinion of former Congressman William Thomas that Houdini's activities constitute MPGE. See Quern v. Mandley, 436 U.S. 725, 736 n.10, 98 S. Ct. 2068, 56 L. Ed. 2d 658 (1978) (noting that "*post hoc* observations [regarding legislative intent] by a single member of Congress carry little if any weight"); Covalt v. Carey Canada, Inc., 860 F.2d 1434, 1438 (7th Cir. 1988) (explaining that "subsequent legislative history," such as an affidavit from a member of the House of Representatives, "is not helpful as a guide to understanding a law"). Nor does the Court rely on the opinion of expert Carol Ptak that Houdini's activities constitute MPGE. Fed. R. Evid. 702. Finally, the Court

The Courts finds that, as a matter of law, Defendants were entitled to the tax refunds for taxable years 2005 and 2006 based on the deductions they claimed under § 199. Accordingly, summary judgment in favor of Defendants is appropriate.

### IV. Conclusion

For the foregoing reasons, the Government's motion is DENIED and the Defendants' motion is GRANTED. Summary judgment shall be entered in favor of Defendants.

IT IS SO ORDERED.

DATED:   May 7, 2013          _____

JAMES V. SELNA
UNITED STATES DISTRICT JUDGE

---

does not rely on the I.R.S. Chief Counsel Opinion, I.R.S. CCA 201246030, 2012 WL 5748553 (Nov. 16, 2012), because it cannot be used or cited as precedent. I.R.C. § 6110(k)(3).